Jesse Mondry, OSB #192559
Harris Sliwoski LLP
511 SE 11th Ave.
Suite 201
Portland, OR 97214
Tel. 503-549-4636
jesse@harris-sliwoski.com

Tara J. Plochocki, DC Bar 989404
Lewis Baach Kaufmann Middlemiss PLLC
1050 K Street NW
Suite 400
Washington D.C. 20001
Tel. 202-659-7217
tara.plochocki@lbkmlaw.com

*Counsel for Petitioner Pinewood Technologies
Asia Pacific Limited*

FILED 22 JAN '24 8:51 USDC-ORP

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| IN RE PETITION OF PINEWOOD TECHNOLOGIES ASIA PACIFIC LIMITED FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:24-mc-58-MC<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782** |

Petitioner Pinewood Technologies Asia Pacific Limited ("PWAP") hereby petitions for an order of judicial assistance, pursuant to 28 U.S.C. § 1782, appointing Tara J. Plochocki, Esq. as a Commissioner of the Court to facilitate subpoenas for the gathering of documentary evidence from Lithia Motors, Inc., also doing business as Lithia & Driveway ("Lithia"), which "resides in" or is "found in" the District of Oregon. Petitioner also seeks an order authorizing the issuance of subpoenas to take the testimony of Lithia executives Matt Whitmer, the Director of

MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR
JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 - 1

Mergers and Acquisitions, and Bryan DeBoer, President and CEO, each of whom is believed to have extensive relevant knowledge. Petitioner aims to obtain limited, but critical, discovery for use in connection with a fraud claim which Petitioner intends to file in an ongoing legal proceeding against Pinewood Technologies PLC ("PWUK") in the High Court of Justice Business and Property Court of England and Wales, Technology and Construction Court.

## FACTUAL BACKGROUND

### A.  Parties and Relevant Agreements

Petitioner is a corporate entity of recent vintage. It was formed in 2017 by David Neilsen and Josephine Lee, each of whom has deep experience in technology/software and the Asia Pacific market, for the sole purpose of promoting and selling PWUK's Dealer Management System ("DMS") to auto dealers and manufacturers in the Asia Pacific region. Declaration of Abigail Healey ("Healey Decl."), ¶¶ 4-5, Ex. 1 ¶ 6, Exs. 2-3. Most Asian auto dealerships used local DMS software, which was tailored to their legal and commercial specifications. *Id.* ¶ 6, Ex. 4. PWAP proposed to break into the Asian Pacific market for PWUK using Neilsen's and Lee's expansive connections in the region to persuade customers to switch over to a UK-based software program. *Id.* Ex. 1 ¶ 7. The Reseller Agreement, entered June 2017 between PWAP and PWUK, reflected the terms of this arrangement. *Id.* ¶ 7, Ex. 5. In short, PWUK licensed PWAP as the exclusive reseller of the DMS in certain "Territories" of the Asia Pacific, among them, Hong Kong, Vietnam, Thailand, and the Philippines. In return, the Reseller Agreement required PWAP to pay monthly fees to PWUK calculated based on the number of user accounts its customers created.

To say that PWAP succeeded would be an understatement. Within the first two years, PWAP entered nine contracts with dealerships and sold 631 user accounts; the Reseller

Agreement's target number had been 250 user accounts. *Id.* ¶ 8, Ex. 6 at ¶ 22; *id.* ¶ 7, Ex. 5 § 5. PWAP doubled down and sought to expand sales to new Territories. Based on its cultivation of contacts in Japan, in January 2019, PWUK offered PWAP a Second Reseller Agreement, identical to the first. *Id.* ¶ 9, Ex. 7. In Japan, PWAP entered into framework agreements with three Original Equipment Manufacturers, 30 dealerships, and generated 764 user accounts, nearly double the target set in the Second Reseller Agreement. *Id.* ¶ 8, Ex. 6 at ¶ 24.

While the Reseller Agreements were in effect, PWUK was not permitted to directly contact customers in PWAP's Territories. Only if the Agreement were to expire or terminate could it communicate directly with signed customers. Exs. 5, 7 at § 4.1. Otherwise, if PWUK wanted to takeover Asia Pacific for itself, and capture the fees generated by all PWAP's work, then it could buy it out. *Id.* § 2.2. The Reseller Agreement specifically authorized a buyout upon three years' notice and set the price at four times the amount PWUK had invoiced PWAP in the previous 12 months, as relevant. Given PWAP's success in the region, this would have been a significant number in any year of the contract.

PWUK wanted PWAP's customers, operations, and territories, but did not want to pay for them. PWUK thus resorted to the cheapest way of doing business: it stole what it wanted. Under the guise of pitching further work with PWAP to new management, PWUK tricked PWAP into sharing its contacts, immediate and long-term expansion strategies, projections, and labor, only to terminate both Reseller Agreements and walk away, leaving PWAP with nothing but sunk costs incurred in its good faith attempts to expand PWUK's reach in the Asia Pacific region. Under English law, this constitutes fraud. Healey Decl. ¶¶ 11, 22. PWAP seeks evidence to support that claim, which will be filed as an additional claim in an existing lawsuit for breach of contract pending in the English courts.

### B.     PWUK's Failure to Perform

PWUK effected its fraud by procuring proprietary information on an accelerated basis and under false pretenses while decelerating the software fixes required by PWAP's customers, impairing its ability to collect fees.

The DMS software was not plug-and-play in the Asia Pacific region; software adjustments (termed Development Items) were essential to enabling the Asia Pacific customers to use the DMS to run their dealerships. These refinements were contractually required of PWUK; sales of DMS would not be particularly effective if the customers could not use the software being sold. Thus, the Reseller Agreements expressly required adjustments based on the legal requirements of the territory, the franchise's own idiosyncratic requirements, and updates to the software. Sometimes, a customer would require tweaking because of need particular to the locality. For example, Japanese customers needed the software to perform currency rounding, because the Japanese yen cannot be invoiced in decimal points. *See* Healey Decl. ¶ 8, Ex. 6 ¶ 17.3. PWAP itself could not make any changes to the DMS. Thus, for the DMS to be functional in particular markets, PWUK had to make localization adjustments or forego that customer/locality, regardless of whether that adjustment was characterized as a legal or franchise or other type of requirement. Given that the parties had an entire agreement devoted to selling the DMS in Japan, PWUK had an obligation to make the DMS usable.

Unless and until PWUK properly developed software for the localization and other requirements, the system could not be rolled out to its users and no revenue could be generated from the customers. PTAP continued to sink time and money into the large-scale DMS implementation projects in Japan and elsewhere, building out an organization able to provide necessary customer support in its clients' countries, and signing up customers but was stymied

by the inability to deliver functional software. *Id.* ¶ 11. For customers in South-East Asia who had gone live with the DMS, significant gaps in the implementation remained. In consequence, PTAP was unable to collect the full user fees from some customers; it tried to implement a separate system as a work-around solution for some Development Items where this was possible. For this reason, a course of dealing evolved whereby PWAP refrained from claiming breach for Pinewood's failure to make adjustments to the DMS software, and PWUK did not demand immediate payment of its invoices to PWAP, since PWAP's liquidity was affected by PWUK's own non-performance. This left PWAP in a vulnerable position, but it trusted the good faith of its counterpart, and proceeded to fulfill its mandate to expand DMS users in the Asia Pacific territories. *Id.* ¶ 11.

### C.  PWUK Defrauds PWAP of Its Entire Business

During the performance of the agreements, there were no disputes between PWUK and PWAP about whether PWUK was, in fact, required to make the DMS usable to the customers PWAP secured. The relationship had been productive and cooperative but took a turn when the CEO of Pendragon PLC—PWUK's parent corporation—retired after 30 years in April 2019. *Id.* ¶ 4, Ex. 1 ¶ 18. From this point forward, the Development Items piled up. PWAP initially became suspicious when it received a flurry of questions from PWUK about the market potential for the territories covered by the Asia Pacific Reseller Agreements (*id.* Ex. 1 ¶ 19), but it received assurances from PWUK that it would not terminate the Reseller Agreements with PWAP because the buyout clauses in the Reseller Agreements were cost-prohibitive. *Id.* ¶ 12.

Thus, PWAP obliged when, in September 2019, PWUK asked PWAP to put together an accelerated growth plan for the Asia Pacific markets, and to include current leads, how to scale the

team, and what would be needed from both sides to achieve that plan. *Id.* ¶ 4, 13; Exs. 1 ¶ 19.2 and 9. PWUK then inquired about investing directly in PWAP. *Id.* ¶ 4. Ex. 1 ¶ 19.4.

Bill Berman replaced the interim CEO of Pendragon in February 2020, at which point, Pendragon/PWUK showed increased interest in PWAP's success. *Id.* ¶ 4, Ex. 1 ¶ 19. On February 25, 2020, David Neilsen was asked to speak to PWUK's CFO about a direct investment to finance expansion of DMS sales. *Id.* ¶ 4, Ex. 1 ¶ 19.5. At the same time, PWAP was informed that it was to upload information concerning the sales pipeline to a new app so that the Pendragon board could stay informed. *Id.* ¶ 14, Ex. 10. A few days later, on March 2, 2020, PWUK's CFO reached out to Neilsen's colleague to ask for more information about what contracts were in the pipeline and what PWAP's expansion plans were, including target customers. *Id.* ¶ 15, Ex. 11. That same day, Neilsen had a meeting with PWUK executives to discuss the potential of the Asia Pacific market and PWAP intended to staff and fund the growth. PWAP was cooperative, as PWUK led PWAP to believe that it was soliciting this information to evaluate investing in PWAP. *Id.* ¶ 15.

While the potential investment remained under evaluation, PWUK's CFO requested PWAP to start forecasting DMS users by month. PWAP complied with the request in the spirit of partnership, unaware that there was never any real consideration of the investment proposal at all. At an April 9, 2020 meeting, PWUK informed PWAP that due to the pandemic, there was no longer an appetite for making an investment in PWAP, which was unusual considering PWUK's unquenchable thirst for data about the Asia Pacific region and PWAP's business plans. PWAP accepted its business partner's answer at face value and asked for a firm commitment on financial accommodations and completion of the Development Items for the continued delays in the DMS for Thailand, Vietnam and Japan. PWUK agreed and asked PWAP to send a proposal with dates. *Id.* ¶ 16.

In June 2020, PWUK's International Implementation Leader conveyed that he had been instructed to "have a consistent visibility of proposals and the pipeline position." *Id.* ¶ 17, Ex. 12. He demanded all client proposals, which were provided, as were international user growth forecasts. These requests died down in early 2021, and the work of expansion continued, but unsteadily, as the Development Items still had not been completed. *Id.* ¶ 4, Ex. 1 ¶ 19.13.

When Neilsen raised the issue directly with PWUK in November 2021, its end game was clear. In response to Neilsen's invocation of his fiduciary duty to his investors, and the more basic proposition that PWAP cannot sell something that does not work, PWUK responded that it could not commit to a delivery date for the development items, but it could simply take over the business from PWAP. *Id.* ¶ 4, Ex. 1 ¶ 21. It made no offer to buy PWAP out: the choice was to be stuck selling something that does not—and will not—work, or hand over its business, which represented the sole means PWAP had of repaying the investors it had secured to expand PWUK's business after it had declined to invest itself.

By deceiving PWAP into believing that PWUK would continue to perform and supported PWAP's plans to expand, it had left PWAP saddled with debt and unable to move forward in sales. At the same time, PWUK asked when it could expect payments to resume per the Reseller Agreement, despite its own nonperformance on rendering the DMS usable for PWAP's customers. *Id.* ¶ 18, Ex. 13. In May 2022, PWUK terminated the first Reseller Agreement for non-payment of the invoices, and in July 2022, PWAP terminated the Second Reseller Agreement on the basis that PWUK had not committed to a date to deliver the adapted DMS for Japanese customers, despite attempts by PWAP to work out a way to deliver these contracts. *Id.* ¶ 8, Ex. 6 ¶¶ 7, 34.

D.   **PWAP Files a Lawsuit for Breach of Contract, Unaware of the Fraud**

PWAP retained counsel and ultimately sued PWUK for breach of contract in late July 2022. Incredibly, PWUK claims that it had no obligation to adjust the DMS software so that the customers could use it. That is, they disavow the so-called localization requirement. *Id.* ¶ 18, Ex. 13. By reverse inference then, in PWUK's view, the Reseller Agreements contained an implied clause restricting PWAP's potential customers to those who would not have any need to localize the DMS software. For the most part, PWUK has admitted that it was on notice of Development Items but denies that the customer *really* needed them and/or avers, for the first time, that PWUK did not understand multiple requests made *years* prior. *See id.* ¶ 19, Ex. 14. This, of course, is not a reasonable way to construe the contract, nor does PWUK offer a reasonable defense to its failure to conform the software. PWUK's behavior post-termination shows that it agreed: after it terminated the Reseller Agreements, it promptly contacted PWAP's customers and made the localization changes PWAP had requested months and years prior. *Id.* ¶ 4, Ex. 1 ¶¶ 24-26.

E.   **PWAP Realizes that PWUK Defrauded in order to Sell PWUK to Respondent Lithia Automotive Group**

As it turns out, Pendragon was not positioning PWUK just to takeover the DMS Asia Pacific business, it was positioning itself for a merger. On August 13, 2022, reports revealed that Lithia Motors Inc. ("Lithia") had made a board-approved cash offer for Pendragon of £460 million, a value that was no doubt enhanced by Pendragon/PWUK's fraud-propelled coup of the Asia Pacific market. *Id.* ¶ 20, Ex. 15. By stringing PWAP along with promises to cure defects in the software and potentially invest, PWUK procured customer contacts and a full-fledged expansion plan. Lulling PWAP into a false sense of security, with full knowledge that it took on investors to support the expansion of the DMS sales, PWUK stalled on Development Items and excused payments on invoices until management was prepared to sell the business altogether. PWUK then

MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR
JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 - 8

did an about-face, claimed breach, thereby relieving themselves from having to buyout PWAP's contracts. Under the terms of the eventual deal, which is set to close at the end of January 2024, PWUK will be spun out and remain listed as a standalone corporation the London stock exchange. *Id.* ¶ 21, Ex. 16. Lithia will invest £30million into Pinewood for a 16.7% equity stake in the new PWUK. Additionally, Lithia will enter into a joint venture with Pinewood in North America to rollout the DMS platform here. Lithia will have control over the entity in the United States and will have the right to takeover the software IP under certain circumstances. *Id.*

### F.  Legal Claim for Which Evidence is Sought

PWAP intends to add a fraud claim against PWUK to its lawsuit for breach of contract. Under English law, a claimant may bring a claim for fraudulent misrepresentation or deceit where it has justifiably relied on false statements which were made knowingly or with reckless disregard for the truth. English courts require evidentiary support of a claim for fraud; claims with insufficient cogent evidence of fraud when pleading the claim are susceptible to dismissal on summary judgment or on the Court's own order. *Id.* ¶ 22.

Information provided by Pendragon to Lithia is likely to contain indicia of whether it intended to force a termination of PWUK's contracts with PWAP. Because PWUK was part of the originally-proposed merger, in the lead up to the original proposal, Pendragon likely shared financial information concerning PWUK's prospects for future profits based on the sales of DMS in the Asia Pacific region, much of which would have belonged on PWAP's balance sheet, unless Pendragon/PWUK had already schemed to get rid of PWAP. If Pendragon acted honestly, then PWUK's liabilities would have included the cost of buying out PWAP's contract. If it did not, then that is evidence of fraud. Similarly, when Lithia and Pendragon restructured the deal to

exclude PWUK after PWAP filed suit, it is likely that there was a discussion of the potential liability presented by that suit.

Two executives from Lithia were deeply involved in the PWUK/Pendragon transactions: Matt Whitmer, the Director of Mergers and Acquisitions, and Bryan DeBoer, President and CEO of Lithia. As Director of Mergers and Acquisitions, Mr. Whitmer played a leading role in the Lithia's evaluation of Pendragon and PWUK, formulating it bids, and interfacing with Pendragon and its representatives. Likewise, throughout the deal, Mr. DeBoer has made statements to the media regarding the value and profits to be expected from the acquisition and partnership. Declaration of Tara J. Plochocki ("Plochocki Decl.") ¶ 2, Ex. 1. Each is reasonably believed to have information about the value of the Asia Pacific market and the sales made by PWAP, whether Pendragon intended to allow the Reseller Agreements to continue, and the potential liability from deceiving PWAP into continuing to perform and incur expenses while PWUK stalled on delivering the software. *Id.*

According to information provided by Pendragon to its shareholders, the specific entity set to acquire Pendragon is Lithia UK Holding Limited, a wholly-owned subsidiary of Lithia Motors, Inc. Healey Decl. ¶ 20, Ex. 15. Lithia Motors also does business as Lithia & Driveway. Plochocki Decl. ¶ 3, Ex. 2. Lithia & Driveway issued the press release from its headquarters in Medford, Oregon announcing its acquisition of Pendragon PLC; this provides a reasonable basis for the belief that the targeted respondent is in possession of evidence sought by this Petition. *Id.* ¶ 4, Ex. 3. Petitioner therefore seeks an order authorizing the issuance of a subpoena for documents from Lithia Motors/Lithia & Driveway.

## LEGAL ARGUMENT

Section 1782 petitions must meet three statutory requirements. *Khrapunov v. Prosyankin*, 931 F.3d 922, 925 (9th Cir. 2019). Courts also consider four discretionary factors, bearing in mind Section 1782's twin aims of "providing efficient means of assistance to participants in international litigation" and "encouraging foreign countries by example to provide similar means of assistance to our courts." *In re Letter of Request from Loc. Ct. in Kusel, Germany*, No. 1:22-CV-01009-CL, 2022 WL 5142753, at *4 (D. Or. Oct. 5, 2022) (quoting *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 252 (2004)).

### A.     The Petition Meets All Three Statutory Requirements of 28 U.S.C. § 1782.

This petition meets the three statutory requirements of Section 1782. The statute requires that: (1) the person from whom the discovery is sought "resides or is found" in the district of the district court where the application is made; (2) the discovery is "for use in a proceeding in a foreign or international tribunal"; and (3) the application is made by a foreign or international tribunal or "any interested person." *Khrapunov*, 931 F.3d at 925 (quoting 28 U.S.C. § 1782) (citing *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)). The petition meets each.

#### 1.     Respondents Lithia, Whitmer and DeBoer Reside or Are Found in Oregon.

Lithia Motors, Inc. is incorporated and headquartered in Oregon. According to the Oregon Secretary of State's corporate registry, its principal place of business is 150 N. Bartlett Street Medford, Oregon. Plochocki Decl. ¶ 5, Ex. 4. Records also reflect that Lithia & Driveway shares the same address. A corporation is found in or resides in a district when it has its principal place of business there. *In re Application of Luis Aron*, No. 3:23-MC-00841-AN, 2024 WL 35454, at *2 (D. Or. Jan. 3, 2024) (granting § 1782 petition against Adidas America, Inc.).

Mssrs. Whitmer and DeBoer also are found in Oregon; their LinkedIn profiles reflect that they are based in Medford, where Lithia maintains its headquarters. *Id.* ¶¶ 7, 8, Exs. 6, 7. Respondents therefore reside or are found in the District of Oregon, and the petition meets Section 1782's first statutory requirement.

### 2. Petitioner's request discovery is for use in a pending proceeding in supported of a claim to be filed therein.

Petitioner has already filed a lawsuit in which it has brought a claim against PWUK and has presented herein the basis for a second claim of fraudulent misrepresentation, which will be filed upon the provision of evidence sought by this Petition. This satisfies the "for use" requirement of § 1782.

The lawsuit in which PWAP will file an additional claim was filed on July 19, 2022. It is still in its early stages, and petitioner may still file another claim. The statute's requirement of obtaining evidence "for use" in a foreign proceeding "does not limit the provision of judicial assistance to 'pending' adjudicative proceedings." *Intel*, 542 U.S. at 258; *In re Will Co. Ltd.*, No. 21-MC-80211-JCS, 2021 WL 5322653, at *2 (N.D. Cal. Nov. 16, 2021) ("§ 1782 does not require that a formal proceeding in the foreign jurisdiction is currently pending, or even imminent; rather, a court may permit discovery under § 1782 so long as a 'dispositive ruling' by the foreign adjudicative body is within 'reasonable contemplation'") (internal citation omitted). In fact, Congress specifically removed the word "pending" from the statute in 1964. S. Rep. No. 1580, 88th Cong., 2d Sess., 7 (1964). Actions or claims reasonably contemplated at the time a petition is filed therefore meet the statute's "for use" requirement. *In re Will Co. Ltd.*, 2021 WL 5322653, at *2 (Japanese company seeking discovery to identify defendants for intellectual property suit in Japan satisfied "for use" requirement). Proclaiming the intent to file a claim and articulating a

legal theory for that claim satisfies this requirement. *Id.* (factor met where declaration stated intent to enforce intellectual property rights and move forward with civil claims).

Here, Petitioner has adduced the basis for its contemplated fraudulent misrepresentation claim to be filed in the lawsuit already pending in the High Court of Justice of England and Wales.

### 3. Petitioner is an "interested person," since Petitioner is the Claimant.

Petitioner is an "interested person" for purposes of Section 1782. The statutory term "interested person" encompasses both parties and contemplated parties to foreign litigation. *In re Will Co. Ltd.*, 2021 WL 5322653, at *2 ("A litigant in a foreign action qualifies as an 'interested person' under § 1782") (internal citations omitted); *see also* 28 U.S.C. § 1782; *Intel*, 542 U.S. at 256 ("the text of § 1782(a), 'upon the application of any interested person,' plainly reaches beyond the universe of persons designated 'litigant'"); *In re Willway Co., Ltd.*, No. 22-MC-80310-BLF, 2022 WL 17331258, at *3 (N.D. Cal. Nov. 29, 2022) ("A litigant in a foreign proceeding is an 'interested person' for purposes of Section 1782. As the putative plaintiff, Willway qualifies as an 'interested person.'") (internal citation omitted); *see In re Furstenberg Fin. SAS*, 785 F. App'x 882, 885 (2d Cir. 2019) (concluding that petitioners intending to file a criminal complaint in Luxembourg were "interested persons").

Here, Petitioner is the Claimant, and thus meets the third statutory requirement of Section 1782. Petitioner thus meets the third statutory requirement of Section 1782.

For these reasons, Petitioner meets the three statutory requirements of Section 1782, and thus the Court should turn to the discretionary factors outlined by the Supreme Court in *Intel*.

### B. The Court Should Grant this Petition in Its Discretion.

Granting this Petition is an appropriate exercise of this Court's discretion. The Supreme Court articulated four factors to consider in exercising discretion under Section 1782. *See Intel*,

542 U.S. at 264-65; *London v. Does 1-4*, 279 F. App'x 513, 515 (9th Cir. 2008); *In re Letter of Request from Loc. Ct. in Kusel, Germany*, 2022 WL 5142753, at *4. Courts consider these factors collectively, not as stand-alone categorical imperatives, and with Section 1782's twin aims of "providing efficient means of assistance to participants in international litigation" and "encouraging foreign countries by example to provide similar means of assistance to our courts" in mind. *In re Letter of Request from Loc. Ct. in Kusel, Germany*, 2022 WL 5142753, at *4 (internal citation omitted). Each factor weighs in Petitioner's favor.

### 4. The discovery sought is beyond the reach of the English Court.

First, courts consider whether the person from whom discovery is sought is a participant in the foreign proceeding, in which case the need for Section 1782(a) aid generally is not as apparent. *In re Borrelli*, No. 20-MC-80154-JSC, 2020 WL 5642484, at *2 (N.D. Cal. Sept. 22, 2020); *In re Glob. Energy Horizons Corp.*, No. 5:15-MC-80078-PSG, 2015 WL 1325758, at *2 (N.D. Cal. Mar. 24, 2015). "Although the case law at times refers to whether the 'person' is within the foreign tribunal's jurisdictional reach, the key issue is whether the material is obtainable through the foreign proceedings." *In re Joint Stock Co. Raiffeinsenbank*, No. 16-MC-80203-MEJ, 2016 WL 6474224, at *4 (N.D. Cal. Nov. 2, 2016) (internal citations omitted). And the first *Intel* factor does "not 'preclude § 1782 discovery of parties participating in the underlying international proceeding.'" *In re Porsche Automobil Holding SE*, No. 15-MC-417 (LAK), 2016 WL 702327, at *7 (S.D.N.Y. Feb. 18, 2016), quoting *In re Auto-Guadeloupe Investissement S.A.*, No. 12-mc-221 (RPP), 2012 WL 4841945, at *5 (S.D.N.Y. Oct. 10, 2012).

Neither Lithia nor its executives will be party to the pending lawsuit in which the contemplated fraudulent misrepresentation claim will be filed. They do not conduct operations from the UK or live there; they are therefore beyond the reach of the English court and their information is not obtainable through the English proceeding. Although Lithia has a wholly-

owned subsidiary—a holding company—in the UK, it will not be a party to the litigation either. English courts do not have the power to compel third parties to make pre-action disclosures in support of contemplated claims. Healey Decl. ¶ 24. Moreover, the UK holding company was only formed in December 2022 (Plochocki Decl. ¶ 6, Ex. 5), which is five months after Pendragon announced the first Lithia bid. It is not likely that Lithia UK even has the relevant evidence because communications relating to the Pendragon/PWUK transactions with Lithia were issued from the respondent parent company Lithia, which is in this district. Petitioner does not have the option of attempting to go through Lithia UK to reach Lithia here; under English law, subsidiaries do not have the power to compel their parent corporation to produce information. Healey Decl. ¶ 24.

Therefore, the discovery sought is beyond the power of the English Court.

### 5. There is no evidence that the English Court in the pending lawsuit would reject discovery obtained through Petitioner's application.

Second, the Court may consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264. To determine if a foreign court would object to the discovery, "courts look for 'authoritative proof that a foreign tribunal would reject evidence obtained with the aid of § 1782.'" *In re Application of Luis Aron*, No. 3:23-MC-00841-AN, 2024 WL 35454, at *2 (D. Or. Jan. 3, 2024). The respondent bears the burden to show that the foreign tribunal would reject the evidence. *See Siemens AG v. W. Digital Corp.*, No. 8:13-CV-01407-CAS, 2013 WL 5947973, at *3 (C.D. Cal. Nov. 4, 2013).

The English lawsuit is an appropriate subject of judicial assistance; its common law undergirds American jurisprudence, and courts in England and Wales are affirmatively receptive to U.S. judicial assistance. *In re Fed. Republic of Nigeria*, No. 121MC00007JGKVF, 2022 WL

4234556, at *5 (S.D.N.Y. Sept. 14, 2022) (granting petition for discovery for use in English courts on the basis that the courts would admit the evidence and the House of Lords had endorsed the use of Section 1782 discovery); *In re Piraeus Bank*, No. 20-MC-210 (RA), 2020 WL 2521322, at *1 (S.D.N.Y. May 18, 2020) (granting petition seeking evidence for use in the High Court of Justice within the Commercial Court of England). Other United States District Courts "have also recognized that English courts are generally receptive to § 1782 discovery." *In Re: Ex Parte Application of Godfrey*, 2018 WL 1863749, at *10 (S.D. Fla. 2018) (collecting cases); *see also In re IKB Deutsche Industriebank AG,* 2010 WL 1526070 at *4 (N.D. Ill. 2010) ("District courts routinely allow discovery related to litigation pending in the United Kingdom.") (collecting cases). Further, Petitioner's English solicitor has declared that she expects the evidence obtained from Lithia in this proceeding to be admissible in the English Court. Healey Decl. ¶ 26.

The second discretionary factor weighs in favor of granting the Petition.

### 6. The application does not circumvent England's laws of evidence.

Third, the *Intel* Court has stated that a district court may consider whether the § 1782 request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." 542 U.S. at 264-65. This petition does not circumvent any prohibitions on proof-gathering. This Petition seeks records of non-privileged communications between counterparties in a corporate acquisition. There is no specific policy in English law that would prohibit use of this type of record; to the contrary, the evidence sought is of the type ordinarily used to support and defend against commercial claims. Healey Decl. ¶ 27.

### 7. The requests are discrete in temporal and substantive scope.

Fourth, courts consider whether the discovery is unduly intrusive or burdensome. *Intel*, 542 U.S. at 264-65. Courts look to the familiar proportionate standard under the Federal Rules of Civil Procedure. *In re Joint Stock Co. Raiffeinsenbank*, 2016 WL 6474224, at *6. Under those

standards, the discovery sought is neither burdensome nor unreasonable. The document requests, copies of which are attached to the Plochocki Declaration as Exhibits 8, 9, and 10, seek documents and communications relating to PWUK and the DMS in the Asian Pacific region, both historically and forward-looking, as well as communications relating to PWAP and/or reseller agreements. This discovery is expected to contain evidence that Pendragon intended to dispense with resellers while it represented to PWAP that they would continue to work together or that it otherwise concealed or misrepresented the liability represented by the Reseller Agreements with PWAP. These are narrow issues given the scope of the Pendragon acquisition, and the evidence is likely entirely electronic and maintained in a deal database and in the inboxes of several Lithia employees. It will be easily searchable. And, while it is unknown when discussions with Lithia first began, the second Reseller Agreement is only four years old; it is highly unlikely that responsive documents span a period of more than three years.

Nor are the requested depositions burdensome. Petitioner seeks to depose Mssrs. Whitmer and DeBoer about a discrete aspect of the overall Pendragon/PWUK transaction and representations made to them by their counterparty. These will not be lengthy examinations, and Petitioner is willing to make accommodations in consideration of respondents' schedules.

Thus, the discretionary factors articulated by the Supreme Court all weigh in favor of granting the Petition.

///

///

///

///

## CONCLUSION

For the foregoing reasons, the Petition for Judicial Assistance should be granted.

DATED this 19th day of January 2024.

By: *s/ Jesse D. Mondry*
Jesse Mondry, OSB #192559
Harris Sliwoski LLP
511 SE 11th Ave.
Suite 201
Portland, OR 97214
Tel. 503-549-4636
Jesse@harris-sliwoski.com

Tara J. Plochocki (DC Bar 989404)
(*pro hac vice* application to be filed)
Lewis Baach Kaufmann Middlemiss pllc
1050 K Street NW
Suite 400
Washington D.C. 20001
Tel. 202-659-7217
tara.plochocki@lbkmlaw.com

*Counsel for Petitioner Pinewood Technologies Asia Pacific Limited*